**IN THE UNITED STATES DISTRICT COURT**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**CASCO, INC.,**

**Plaintiff,**

**v.**                                                    **CIVIL NO. 13-1325 (GAG)**

**JOHN DEERE CONSTRUCTION CO.**
**AND FORESTRY CO.,**

**Defendant.**

## OPINION & ORDER

Casco Sales ("Casco") sued John Deere Construction Company and Forestry Company ("John Deere") for violation of the Puerto Rico Dealers Act, P.R. LAWS. ANN. tit. 10 §§ 278 *et seq.* ("Law 75"). Casco and John Deere both submitted motions for summary judgment and accompanying statements of fact. (Docket Nos. 64-67.) The parties submitted substantial oppositions and replies to the memoranda of law and statements of fact. (Docket Nos. 68, 74, 75, 82, 85, 86, 87, 89, 96, 103, 104, 106, 107.) For the following reasons, the court **DENIES** both motions for summary judgment at Docket Nos. 64 & 66.

**I.     Standard of Review**

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway

1

Civil No. 13-1325 (GAG/BJM)

1  the outcome of the litigation under the applicable law.'" <u>Iverson v. City of Boston</u>, 452 F.3d 94, 98 (1st

2  Cir. 2006) (alterations in original) (citation omitted).

3     The moving party bears the initial burden of demonstrating the lack of evidence to support the

4  non-moving party's case. <u>Celotex</u>, 477 U.S. at 325. "The movant must aver an absence of evidence to

5  support the nonmoving party's case. The burden then shifts to the nonmovant to establish the existence

6  of at least one fact issue which is both genuine and material." <u>Maldonado-Denis v. Castillo-Rodriguez</u>,

7  23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact is genuinely in dispute by citing

8  particular evidence in the record or showing that either the materials cited by the movant "do not

9  establish the absence or presence of a genuine dispute or that an adverse party cannot produce admissible

10  evidence to support the facts." FED. R. CIV. P. 56(c)(1)(B). If the court finds that some genuine factual

11  issue remains the resolution of which could affect the outcome of the case, then the court must deny

12  summary judgment. <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986).

13     When considering a motion for summary judgment, the court must view the evidence in the light

14  most favorable to the non-moving party. <u>Id.</u> at 255. Moreover, at the summary judgment stage, the court

15  does not make credibility determinations or weigh the evidence. <u>Id.</u> Summary judgment may be

16  appropriate, however, if the non-movant's case rests upon conclusory allegations, improbable inferences,

17  and unsupported speculation. <u>Forestier Fradera v. Mun. of Mayaguez</u>, 440 F.3d 17, 21 (1st Cir. 2006)

18  (citation and quote marks omitted).

19  **II.     Statement of Facts**

20
21     In September 1986, Casco and John Deere executed the John Deere Agreement Industrial

22  ("Agreement") for the sale and distribution of John Deere construction equipment and parts in Puerto

23  Rico and the Virgin Islands. (Docket No. 87 ¶ 1.) John Deere classifies the agreement as one for the

24  resale of its equipment. (<u>Id.</u>) Casco, a Puerto Rico company, primarily engages in the sale, distribution,

**Civil No. 13-1325 (GAG/BJM)**

1    and service of construction equipment and parts in Puerto Rico.  (Id. ¶ 3.)  John Deere disputes this

2    description, claiming that "Casco's audited financial statements for fiscal year ending in September 2010

3    describe it as primarily engaged in the sale, service, and rental of industrial, agricultural, gardening, golf

4    and turf, and construction equipment, and that the rental division leases equipment to third parties on a

5    month to month basis."  (Id.)  Casco counters that it sold its rental division in December 2011 and has

6    since devoted its efforts to the sale, distribution, and service of construction equipment and parts.  (Id.)

7    Casco goes as far as stating that it was exclusively dedicated to the sale, distribution, and service of

8    construction equipment and parts.  (Docket No. 87 ¶ 4.)  John Deere restates that Casco's internal audits

9    reveal the same description as its September 2010 audit, which Casco disputes for the same reasons and

10   deems a legally insignificant distinction.  (Id.)

11        Casco classifies John Deere as its most important product line in terms of volume and dollar sales,

12   referring to it as the livelihood of its business.  (Id. ¶ 5.)  John Deere objects to the statement as vague for

13   failing to specify when it became the most important line, and Casco replies that John Deere became its

14   most important line in July 2000.   (Id.)  On October 1, 2009, Casco Rental and Casco Sales merged to

15   become Casco.  (Id. ¶ 6.)  The parties dispute the extent of John Deere's interest in Casco.  (Id. ¶ 7.)

16   From 2009 to December 2011, Casco rented John Deere's construction equipment to its customers.  (Id. ¶

17   8.)  Volvo Construction Equipment Rents subsequently purchased Casco's rental division.  (Id. ¶ 9.)

18   After the purchase, Casco continued to sell, distribute, and/or provide service to John Deere construction

19   equipment and parts in Puerto Rico until its relationship with John Deere ended.  (Id. ¶ 10.)  The

20   termination of the relationship is the focal point of contention in this case that the court will investigate in

21   its analysis.  Casco claims the termination was a unilateral decision of John Deere's in breach of Puerto

22   Rico distributor law and John Deere counters that Casco breached the Agreement.  (Id.)  The court will

Civil No. 13-1325 (GAG/BJM)

1  elaborate on the facts surrounding these divergent perspectives below in the context of John Deere's

2  alleged breach of Law 75.

3  **III.    Discussion**

4      Law 75 was enacted specifically to remedy the abusive practices of suppliers who arbitrarily

5  eliminate distributors after they invest in the business and successfully establish a market in Puerto Rico

6  for the supplier's product or service.  Waterproofing Sys. v. Hydro-Stop, Inc., 440 F.3d 24, 28-29 (1st Cir.

7  2006) (citations and quote marks omitted).  It provides that no principal or grantor may directly or

8  indirectly perform any act detrimental to the established relationship except for just cause.  Id. (citation

9  and quote marks omitted).

10      "Some actions by the principal . . . establish a rebuttable presumption of impairment: whenever a

11  principal bypasses a dealer by distributing merchandise directly; appoints additional dealers in

12  contravention of the agreement; fails to adequately fill orders; or arbitrarily changes the transportation

13  and/or payment terms."  Sun Blinds, Inc. v. S.A. Recasens, 111 F. App'x. 617, 619 (1st Cir. 2004)

14  (internal citation and quotation marks omitted).  "If a plaintiff proves termination or impairment of the

15  business relationship by the defendant, Law 75 provides a formula for indemnification but only 'to the

16  extent of the damages caused.'" Id. (citing 10 P.R. LAWS ANN. § 278b). The party invoking Law 75 bears

17  the burden of proving damages.  Id.

18      Law 75 regulates the termination of a supplier's relationship with a dealer regardless of any

19  unilateral right to terminate present in a contract.  See Re-Ace, Inc. v. Wheeled Coach Indus., 363 F.3d

20  51, 54 (1st Cir. 2004).  "In 1966, the protection afforded to distributors under Law 75 was extended to

21  include the conduct of a principal detrimental to the established relationship, even where the contract was

22  not terminated."  Caribe Indus. Sys. v. National Starch & Chem. Co., 212 F.3d 26, 29 (1st Cir. 2000)

23  (citations and quote marks omitted).  "Ultimately, 'just cause' under Law 75 is a question of fact," and so

Civil No. 13-1325 (GAG/BJM)

1    are "the subsidiary issues" of "whether the contracting parties considered the particular contract

2    obligation allegedly breached by the dealer to be 'essential'" and "whether any other 'non-breaching'

3    acts or omissions by the dealer were nonetheless sufficiently egregious to have adversely and

4    substantially affected the interest of the principal or grantor in promoting the marketing or distribution of

5    the merchandise or service." R.W. Int'l Corp. v. Welch Foods, 88 F.3d 49, 51-52 (1st Cir. 1996)

6    (internal citations and quote marks omitted).  For example, "failure to meet a distribution quota will only

7    constitute just cause for impairment under Law 75 if that quota is shown to be 'reasonable' given the

8    state of the Puerto Rican market at the time of the alleged violation."  Casas Office Machs. v. Mita

9    Copystar Am., 42 F.3d 668, 679 (1st Cir. 1994).

10       "If a supplier cannot prove 'just cause' for termination of a dealership agreement, the statute

11   authorizes the court to compensate the dealer 'for the hard-earned clientele unjustly appropriated by the

12   supplier.'" Sheils Title Co. v. Commonwealth Land Title Ins. Co., 184 F.3d 10, 14 (1st Cir. 1999)

13   (citation omitted).   "Just cause is defined as the: nonperformance of any of the essential obligations of

14   the dealer's contract, on the part of the dealer, or any action or omission on his part that adversely and

15   substantially affects the interests of the principal or grantor in promoting the marketing or distribution of

16   the merchandise or service." Id. n. 8.  "[I]f no just cause exists for termination of the dealer's contract

17   'the principal shall have executed a tortious act against the dealer and shall indemnify it to the extent of

18   the damages caused him . . . .'" Id. n.9 (citation and quote marks omitted).

19       "Not all commercial relationships are protected by Law 75. Rather, before invoking the remedies

20   provided by the statute, a court must first determine whether the commercial relationship at issue

21   constitutes a 'dealer's contract . . . .'"[1] Sheils Title, 184 F.3d at 14.   "The terms 'dealer,' 'distributor,'

22   and 'distributorship' are used interchangeably in the caselaw concerning Law 75." Re-Ace, 363 F.3d at

---

[1] John Deere does not argue that the commercial relationship at issue is not a dealer's contract and thus the court assumes as much.

Civil No. 13-1325 (GAG/BJM)

1  54 n.3. "Law 75 defines a dealer as a person actually interested in a dealer's contract because of his

2  having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a

3  given merchandise or service." Id. (citation and quote marks omitted). A contract with a dealing under

4  Law 75 is defined as a "relationship established between a dealer and a principal or grantor whereby . . .

5  the former actually and effectively takes charge of the distribution of a merchandise, or of the rendering

6  of a service, by concession or franchise, on the market of Puerto Rico." Id. (citation omitted).

7  Furthermore, "it is equally true . . . that Law 75 does not operate to convert non-exclusive distribution

8  contracts into exclusive distribution contracts," and the "established relationship between dealer and

9  principal is bounded by the distribution agreement and therefore the Act only protects against detriments

10  to contractually acquired rights." Borschow Hosp. & Medical Supplies v. Cesar Castillo Inc., 96 F.3d 10,

11  14 (1st Cir. 1996).

12        Casco alleges John Deere impaired the Agreement on December 18, 2012 by unilaterally

13  canceling a purchase order for a John Deere excavator sold by Casco for $264,000. (Docket No. 64 at 1-

14  2.) It asserts that this impairment constitutes a constructive termination[2] that materially impacted its cash

15  flow. (Id. at 2.) It seeks damages consisting of five years of lost profits, loss of goodwill, and the

16  recovery of other consequential damages and expenses. (Id.) Casco classifies John Deere's rationale for

17  the cancelation as solely reliant on its purported failure to comply with new model qualification

---

[2] The issue of whether Law 75 affords relief for constructive termination is, even according to Casco's lead counsel, an undeveloped question of Puerto Rico law. See Ricardo Casellas & Manuel A. Pietrantoni, Puerto Rico's Dealer and Franchise Statute Adapts to the Latest Developments in Law, Commerce, and Technology, 30 FRANCHISE L.J. 10, 13 (2010), available at http://www.americanbar. org/content/dam/aba/migrated/forums/franchising/publicdocuments/20110309_flj_30_1_entireissue.authc heckdam.pdf (stating the only Puerto Rico case on the issue is unreported, does not discuss constructive termination, and provides no analysis on the matter). Reading constructive termination into Law 75's potential causes of action strays from the statute's terms. The Puerto Rico courts and legislature are capable of stating with greater clarity that such action falls under Law 75's umbrella. In the mean time, a federal court sitting in diversity jurisdiction should not impose unique and unexplored rationale absent sufficient justification, which does not exist here. The court thus reads Casco's claim of constructive discharge as an effort to emphasize the impairment it endured and which ostensibly violated Law 75.

**Civil No. 13-1325 (GAG/BJM)**

1    ("NMQ") requirements for the purchase of a new model of a machine with an IT-4 engine.  (Id.)  Casco

2    claims the Agreement "does not specify that compliance with NMQs is an 'essential' obligation of the

3    dealer." (Id.)

4         Casco elaborates that the NMQs were not essential obligations and that failure to comply with

5    them did not constitute a material breach.  (Docket No. 64 at 2.)  Casco provides two reasons for this: (1)

6    John Deere violated an internal policy to grant is dealers a "grace period" of 90 days to complete the

7    NMQ's after consummation of the sale and delivery of a new model of a machine to the customer, and;

8    (2) John Deere offered to sell a new machine with the same engine to Monsanto in February 2013 for

9    which Casco would have received a twelve percent commission.  (Id.)  Casco thus asserts that John Deere

10    failed to terminate or impair their relationship for just cause. (Id.)

11         Casco argues that the "record is devoid of any admissible evidence for [John Deere] to rebut the

12    presumption of impairment arising from its unjustified, arbitrary and discriminatory cancelation of

13    Casco's purchase order." (Id. at 8.)  "The only reason that [John Deere] ever had for the cancelation"

14    was Casco's noncompliance with NMQ requirements, which was "neither an essential obligation . . . nor

15    a material breach that was incapable of cure." (Id.)  "On the contrary," Casco claims, "the record

16    establishes that non-compliance with the NMQ's did not substantially and adversely affect [John

17    Deere]'s interests in Puerto Rico." (Id. at 8-9.)  Casco asserts no customers complained about its services

18    and that it would have complied with the NMQs after the sale and delivery of the machine to the end-user.

19    (Id. at 9.)  Last, Casco states that John Deere canceled the order in December 2012 in bad faith and that,

20    had Casco enjoyed the ninety-day grace period required by the Agreement to complete the NMQs, then

21    the March 2013 termination would have been unnecessary and unwarranted.  (Id.)

22         Casco relies on the terms of the Agreement in arguing that NMQ compliance is not a part of its

23    essential obligations, claiming that John Deere unilaterally implemented the NMQ requirement more than

**Civil No. 13-1325 (GAG/BJM)**

1    two decades after executing the Agreement.  (Docket No. 64 at 9.)  Specifically, Casco cites Article 3 of

2    the Agreement.  (Id.)  Article 3 establishes the dealer's essential obligations and, according to Casco,

3    nowhere in Article 3 does NMQ compliance appear.  (Id.)  It asserts Article 3 does not oblige it to

4    "purchase parts and tools regardless of business necessity or market realities or take training courses to

5    repair new equipment as a condition for sale."  (Id.)

6         In the alternative, Casco avers that, even if NMQ compliance were essential, it was not material

7    or incapable of cure, and the timing of compliance did not adversely impact John Deere's interests in

8    Puerto Rico.  (Docket No. 64 at 10.)  In support of this argument, Casco relies on its characterization of

9    John Deere's internal NMQ policy, which ostensibly provides a ninety-day grace period to comply with

10   the NMQs after delivery of the new equipment to the customer.  (Id.)  In Casco's opinion, John Deere

11   should have honored the order and followed its policy because the 290GLC excavator was a new model

12   that Casco had not previously ordered.  (Id.)  Casco cries foul because it claims John Deere allows its

13   dealers in Latin America to comply with NMQs after the ninety-day grace period expires, and because

14   Casco employees were taking training courses on NMQ compliance between December 2012 and March

15   29, 2013.  (Id.)  Furthermore, John Deere sent a purchase lead for a new 320 Skid Steer Loader with an

16   IT-4 engine, just like the one in the 290GLC excavator according to Casco, to Monsanto Corp., one of

17   John Deere's national accounts with operations in Puerto Rico.  (Docket No. 64 at 11.)  Casco claims this

18   action constituted a relaxation of the NMQ requirements for Monsanto to Casco's detriment.  (Id.)

19   Because John Deere terminated the relationship without just cause, Casco concludes, it is also liable for

20   *exception non adimpleti contractus* and breach of good faith and fair dealings ("dolo").  (Id. at 12.)

21        John Deere replies with several arguments.  First, it correctly claims that Law 75's rebuttable

22   presumption of impairment turns not on whether it terminated the parties' relationship with just cause,

23   but whether such termination was "unjustifiable."  (Docket No. 74 at 3-6.)  Second, it claims the

**Civil No. 13-1325 (GAG/BJM)**

1    presumption applies to cancelation of multiple orders, whereas only one order was canceled here.  (Id. at

2    6.)  This argument is inapposite and grounded in no legal justification.  Third, it claims the order

3    cancelation did not impair Casco's contractually acquired rights and could not constitute an impairment.

4    (Id. at 9.)  Indeed, Law 75 "only protects against detriments to contractually acquired rights."  Vulcan

5    Tools v. Makita USA, 23 F.3d 564, 569 (1st  Cir. 1994) (citation omitted). Fourth, it ostensibly had just

6    cause for a number of reasons: (a) Casco violated its essential obligation to maintain NMQ compliance

7    and cannot demonstrate that John Deere acted contrary to its own NMQ policy; (b) lack of payment of

8    $149,267.70 in past due fees; (c) failure to maintain an adequate level of positive net worth in violation

9    of Article 3 of the Agreement; (d) failure to maintain an adequate inventory of parts and equipment (or

10   any inventory whatsoever) in violation of the Agreement; (e) failure to maintain adequate and trained

11   personnel; (f) failure to actively promote sales of John Deere products; (g) failure to display proper

12   identification; (h) failure to take appropriate corrective action or to provide it with a business plan

13   between 2009 and 2013; and (i) failure to provide financial information.  (Id. at 10-16; Docket No. 66 at

14   2-15.)  Fifth, John Deere asserts that Casco cannot prove damages, a requirement under Law 75.    (See

15   generally Docket No. 74.)

16          At bottom, the crux of the competing motions for summary judgment turns on whether John

17   Deere inappropriately impaired Casco by rejecting the purchase order in December 2012 and terminating

18   the Agreement in March 2013 for indebtedness or whether it did so with just cause.  To gain greater

19   perspective on the parameters of Law 75 and breaches thereof, the court begins by discussing

20   "unjustifiability" and "just cause" in the context of the statute and the terms of the Agreement which

21   were allegedly breached.   Failure to fill the December 2012 order contemplates the rebuttable

22   presumption Law 75 establishes for impairment of existing relationships: "It shall be presumed, but for

23   evidence to the contrary, that a principal or grantor has impaired the existing relationship . . . when the

**Civil No. 13-1325 (GAG/BJM)**

1   principal or grantor unjustifiably refuses or fails to fill the order for merchandise sent to him by the dealer

2   in reasonable amounts and within a reasonable time."  P.R. LAWS. ANN. tit. 10 § 278a(1)(b)(3).  Casco

3   frames this denial as "unjustifiable" and John Deere marshals evidence that the denial constitutes "just

4   cause" to rebut the presumption, a categorization which Casco refutes.  The court turns to the terms of the

5   Agreement, namely the "Essential Obligations" section, to ascertain whether John Deere had "just cause"

6   or acted in an "unjustifiable" manner.

7          The "Essential Obligations" the breach of which merit possible termination include: maintaining

8   sufficient positive net worth, stocking and maintaining an adequate parts inventory, promptly fulfilling

9   warranty obligations, stocking and maintaining adequate goods, maintaining adequate sales, parts, and

10   service facilities and adequately trained personnel, actively promoting the sale of goods, identifying

11   facilities with approved John Deere signs, and cooperation with periodic reviews and correction of

12   deficiencies.  (Docket No. 67-1 at 5.)  As discussed above, John Deere attempts to demonstrate just cause

13   for terminating the Agreement by relying on nearly all of these elements.  A cursory glance at nearly all

14   of them, however, yields a common theme: resolving whether a breach occurred requires assessing the

15   adequacy or reasonableness of Casco's performances and course of conduct, an investigation which turns

16   entirely on fact.  When factual questions surrounding Law 75 claims exist, summary judgment is

17   typically not the appropriate avenue by which to dispose of the case; rather, the factfinder must render its

18   opinion on the reasonableness or adequacy of the distributor's conduct based upon the circumstances and

19   whether it constitutes "just cause." See  R.W. Int'l Corp. v. Welch Foods, Inc., 88 F.3d 49, 51 (1st Cir.

20   1996) (just cause typically a question of fact for jury).

21          The core of John Deere's argument lies in whether it denied Casco's purchase order for just cause for

22   Casco's purported failure to maintain NMQ compliance with the particular machine at issue.  While there

23   are many issues in this case, the leading question is a simple one and it turns on facts: as discussed, Casco

**Civil No. 13-1325 (GAG/BJM)**

1   admits its personnel were training, but not fully trained, in NMQ compliance on the machine at issue and

2   that the breach was not incurable.  John Deere asserts that NMQ compliance was a prerequisite and

3   failure to comply merited denial of the purchase order and ostensible impairment.  Either side might be

4   correct, but their correctness depends on a factual inquiry, namely, whether NMQ compliance was an

5   "essential obligation" and prerequisite to filling a purchase order.  A genuine issue of material fact thus

6   exists necessitating denial of the motions for summary judgment.  If John Deere had just cause, then the

7   impairment was not unjustifiable and no presumption exists.  In contrast, if John Deere lacked just cause,

8   then the impairment was unjustifiable.

9   The court briefly turns to supplemental issues.  As mentioned above, Casco also alleges John

10  Deere is liable for *exception non adimpleti contractus* and breach of good faith and fair dealings ("dolo").

11  (Docket No. 64 at 12.)  But Casco attaches this allegation to the success of its claim for breach of Law 75.

12  Given that issues of fact will decide the outcome of the dispute surrounding the Law 75 claim, the court

13  refrains from opining on these other two claims.  Casco does not argue separate liability in the event that

14  its Law 75 claim fails, so the court shall render judgment on this matter following resolution of the

15  factual issues at play in the Law 75 dispute.

16  Second, Casco bears the burden of proving damages.  Failure to do so merits dismissal in John

17  Deere's favor.  John Deere, as mentioned, claims Casco cannot prove damages even if NMQ compliance

18  is not an essential obligation, but this argument is unpersuasive.  Casco earns revenue by distributing

19  John Deere's products in Puerto Rico.  If John Deere denies Casco the ability to distribute its products,

20  Casco's revenue will suffer.  The same logic applies to John Deere's termination of the Agreement in

21  March 2013 for Casco's failure to pay on its debt.  Reasonable minds could differ as to whether (1) John

22  Deere denied the purchase order with just cause, and; (2) Casco was consequently unable to pay John

23  Deere on its debt partially because John Deere refused to continue to effectuate the Agreement.

11

Civil No. 13-1325 (GAG/BJM)

1    Nevertheless, "paying for goods on time normally is one of the essential obligations of the dealer's

2    contract, the non-fulfillment of which can constitute just cause under Law 75.  However, we have

3    recognized an exception in those unusual cases where a supplier does not care about late payments."

4    <u>Waterproofing</u>, 440 F.3d at 29.  Indeed, "[i]t is contrary to . . . Law 75 to require that suppliers terminate

5    distribution agreements immediately upon distributors' failure to pay timely, or risk being forever banned

6    from so doing."  <u>Id.</u> at 30.  But to ignore the possibility that John Deere's refusal to honor the purchase

7    order may have impacted Casco's ability to timely pay its debt would ignore reality.  This is yet another

8    issue that turns on fact.

9    **IV.**    **Conclusion**

10    For the reasons stated above, the motions for summary judgment at Docket Nos. 64 & 66 are

11    **DENIED.**


        **SO ORDERED** this 26th day of August 2014.


<u>/s/ Gustavo A. Gelpi</u>
Gustavo A. Gelpi
United States District Judge
