## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

CASCO, INC.,

      PLAINTIFF,

          v.                                **CIVIL NO. 13-1325 (PAD)**

JOHN DEERE CONSTRUCTION &
FORESTRY COMPANY,

      DEFENDANT.

---

### OPINION AND ORDER

Delgado-Hernández, District Judge.

Casco Inc. sued John Deere Construction & Forestry Company under the Puerto Rico Dealers Act, P.R. Laws Ann. tit. 10 §§ 278, *et seq*. ("Law 75"), and the Puerto Rico Civil Code, P.R. Laws. Ann. tit. 31. John Deere answered the complaint denying liability and counterclaimed against Casco for collection of unpaid invoices due (Docket No. 28). During trial, the court granted John Deere's request under Fed. R. Civ. P. 50(a) to dismiss Casco's Civil Code claims and to enter judgment on its counterclaim (Docket No. 235). The jury awarded Casco $1,763,934.00 under Law 75 (Docket No. 243). The court entered judgment for Casco accordingly, together with $216,912.92 for John Deere's counterclaim. Before the court are:

- Casco's "Verified Post-Judgment Application of Fees, Costs and Interest" (Docket Non. 251) and "Memorandum of Law In Support of Motion and Verified Post-Judgment Application of Attorney's Fees, Expert Witness Fees, Taxable Costs, and Prejudgment Interest" (Docket No. 253).

- John Deere's Bill of Costs (Docket No. 260), which Casco opposed (Docket No. 267). John Deere replied (Docket No. 280).

- John Deere's "Motion to Dismiss, Without Prejudice, Plaintiff's Application for Fees, Costs and Interest" (Docket No. 263), which Casco opposed (Docket No. 266). John Deere replied (Docket No. 274), following up with a "Motion Reiterating 'John Deere's Motion to Dismiss Without Prejudice, Plaintiff's Application for Fees, Costs and Interests' and For Further Extension of Time" to file response/reply to Casco's motion and verified post-judgment application of attorney's fees (Docket No. 287).

- "Plaintiff Casco Inc.'s Motion and Memorandum of Law to Alter or Amend Order and Judgment, for Partial New Trial, and for Entry of Judgment on the Counterclaim as a Matter of Law" (Docket No. 264), which John Deere opposed (Docket No. 286). Casco replied (Docket No. 293) and John Deere sur-replied (Docket No. 299).

- "John Deere Construction & Forestry Company's Consolidated Motion and Memorandum of Law Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure (Docket No. 269), which Casco opposed (Docket No. 277). John Deere replied (Docket No. 294).

For the reasons explained below, the requests at Docket Nos. 251 and 253 are DENIED WITHOUT PREJUDICE; the motion to dismiss without prejudice at Docket No. 263 is GRANTED; the motion at Docket No. 287 is DENIED AS MOOT; the motion at Docket No. 264 is DENIED; the motion at Docket No. 269 is GRANTED IN PART AND DENIED IN PART; and the Bill of Costs at Docket No. 260 is DENIED.

## I.    BACKGROUND

Casco and John Deere were parties to a distribution agreement, pursuant to which Casco distributed John Deere products in Puerto Rico and the U.S. Virgin Islands. The relationship

deteriorated, and in 2009, Casco initiated an action against John Deere asserting Law 75 violations. That case was settled.  In 2013, however, John Deere terminated the distributor contract.  This action ensued.

Motions for summary judgment were filed, opposed, replied to and denied (Docket Nos. 64, 66, 74, 77, 85, 103, and 117).  Contested motions *in limine* (Docket Nos. 156, 162, 163, 164, 177, 180, 185, 186, 187, and 188), were granted in part and denied in part (Docket No. 193). Additional disputes followed with respect to pretrial stipulations, disclosures, the counterclaim, and on whether witnesses should testify in the English language rather than through an interpreter (Docket Nos. 198, 200, 201, 202,  203, 208, 206, 213, 218, 228, 235 and 236).  The jury trial lasted nine days (Docket Nos. 222 223, 226, 227, 235, 237, 238 239, and 241).  Judgment was entered on March 11, 2016 (Docket No. 249).

## II.    DISCUSSION

### A. Standard of Review.

The parties have filed motions to alter or amend judgment, for judgment as a matter of law, for *remittitur* and new trial (Docket Nos. 264, 269, 277, 286, 293, 294, 299).  Rule 50(a) of the Federal Rules of Civil Procedure allows a party during a jury trial to move for judgment as a matter of law if the opposing party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.  Fed. R. Civ. P. 50(a). Rule 50(b) provides that if the court does not grant the motion, then no  later than 28 days after the entry of judgment, the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59 of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 50(b).

A new trial is appropriate if the verdict is against the weight of the evidence, such that upholding it will result in a clear miscarriage of justice.  See, Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009)(stating test).  Courts are empowered to grant a *remittitur* when the size of the verdict is against the weight of the evidence.  See, Van Blargan v. Williams Hospitality Corp., 759 F.Supp. 940, 944 (D.P.R. 1991)(so recognizing).  In such cases, the court grants the plaintiff an election to remit a stated portion of the amount awarded as damages or submit to a new trial.  Id.   A party may ask a court to amend its judgment under Rule 59(e) of the Federal Rules of Civil Procedure based on newly discovered material evidence or an intervening change in the law, or because the court committed a manifest error of law or fact.  See, Bogosian v. Woloohojian Realty Corp., 323 F.3d 55, 72 (1st Cir. 2003)(setting forth grounds justifying relief under Rule 59(e)); Aybar v. Crispin-Reyes, 118 F.3d 10, 16 (1st Cir. 1997)(same).

**B.  Casco's Claims.**

At the close of Casco's case, the court granted John Deere's Rule 50(a) motion for judgment as a matter of law, dismissing Counts 3 and 4 of the Verified Complaint and granting John Deere's counterclaim.  Casco seeks post-trial relief under Fed. R. Civ. P. 59, arguing the court committed a manifest legal error justifying the relief sought.

**1.  Count 3.**

In Count 3, Casco essentially claims that John Deere is liable for not giving Casco pre-termination notice (Docket No. 264 at pp. 3, 21-22).  It argues the court erred in dismissing the claim because the principle of good faith applies in all commercial dealings, and that unilateral termination of a distribution contract must be done with prior notice to the dealer considering the nature and characteristics of the franchise.  Id.

Casco, Inc. v. John Deere Construction Company & Forestry Company
Civil No. 13-1325
Opinion and Order
Page 5

First, the Civil Code does not carry a pre-termination requirement for commercial relationships. And except in market withdrawal scenarios, Law 75 does not require pre-termination notice unless it is part of the distribution contract. See, Kemco Food Distribution, Inc. v. R.L. Schreibner, Inc., 2016 WL 814833, at *3 (D.P.R. February 29, 2016)(so acknowledging in non-withdrawal setting).[1] The Dealer Agreement here did not require John Deere to provide Casco with pre-termination notice. Rather, termination would be effective upon John Deere's providing notice of termination.

Second, during argument on John Deere's Rule 50(a) motion at trial, Casco's counsel agreed there was no need to submit Count 3 to the jury:

> THE COURT: I mean, how would the remedy differ under Count Three from the remedy under Count Two?[2]
>
> MR. CASELLAS: It doesn't differ at all.
>
> THE COURT: So it's the same thing.
>
> MR. CASELLAS: Good faith is part of every contractual obligation.
>
> THE COURT: So you do not get extra damages under Count Three.
>
> MR. CASELLAS: Absolutely. There is no – THE COURT: You do not.
>
> MR. CASELLAS: There is no independent measure of damages for Count Three. I am willing to stipulate to that.
>
> THE COURT: Okay.

---

[1] Medina & Medina v. Country Pride Foods Ltd., 858 F.2d 817 (1st Cir. 1988) is not to the contrary. In Medina the principal announced that it was withdrawing from the Puerto Rico market, and therefore needed to terminate the contractual relationship. Because Law 75 only allows termination when the dealer breaches an essential obligation of the dealer agreement, the Supreme Court of Puerto Rico recognized market withdrawal as just cause for termination; and correspondingly, established a *sui generis* prior notice term applicable to instances of a principal's withdrawal from the market. Id. at pp. 823-824. There is no evidence that John Deere withdrew from the Puerto Rico market.

[2] Count 2 states that John Deere unjustly terminated the distribution agreement under Law 75.

MR. CASELLAS: The Court doesn't have to dismiss that claim for me to stipulate that we are not asking the jury for an independent damages determination on Count Three.

THE COURT: And then, what would be the basis of submitting Count Three to the jury, if we are not asking the jury to award damages in Count Three?

MR. CASELLAS: Well, Your Honor, except to note that the duty of good faith is inherent in every contractual obligation. There is no independent basis for recovery. And we're not seeking recovery for an independent breach of the duty of good faith.

In fact, Your Honor, if you could look at the Special Verdict Form, I did not include, for this particular count, an independent basis for recovery.

THE COURT: Right. And we can stipulate, at the same time, that the Puerto Rico Supreme Court has said that good faith is expected in all commercial relationships. It's a constant.[3]

But we've reached the point where I believe we, we have to be at in order to understand the difference between Count Three and Count Four. With regard to Count Three, Casco is not asking for damages.

MR. CASELLAS: That's correct.

THE COURT: So from my perspective, there would be no need to submit Count Three to the jury.

MR. CASELLAS: I agree.

Under these circumstances, Casco's request to vacate dismissal of Count 3 must be

denied.

---

[3] In Jury Instruction No. 20 the court informed the jury that: "Contracts are perfected by mere consent, and from that time they are binding, not only with regard to the pre-fulfillment of what has been expressly stipulated, but also with regard to all consequences which, according to their character, are in accordance with good faith, use, and law"(Docket No. 244).

2.  **Count 4**.

In Count 4, Casco states that John Deere acted with *dolus* to induce Casco to settle in 2009

a constructive termination claim under Law 75 (Docket No. 264 at pp. 4, 9-21).  On this theory,

had Casco not been deceived into settling the 2009 Lawsuit, it would have (a) pursued a claim

for constructive termination; and (b) prevailed on such a claim, thus recovering benefits under Law

75 for the five-year period preceding 2009, which would have purportedly been higher than the

benefits for the five-year preceding 2013, when the Dealer Agreement was actually terminated.[4]

To this end, the Verified Complaint states that:

> 55.    Deere entered into the Settlement Agreement under false and
> misleading pretenses never intending in good faith to comply with
> its terms and looking for any excuse to terminate the Dealer
> Agreement[].  By dismissing the federal action, Casco relied to its
> detriment on the material obligations of Deere in the Settlement
> Agreement.  Had Casco not been deceived, it would have obtained
> a preliminary injunction to enjoin Deere and would have asserted a
> constructive termination claim under Law 75 for five years of lost
> benefits prior to 2009 which, because of market and economic
> conditions in Puerto Rico outside of Casco's control, should be
> greater than the net benefits due for the five-year period prior to the
> actual termination on March 29, 2013.

(Docket No. 1 at ¶ 55).  The court dismissed the claim under Rule 50 because Law 75 does not

recognize constructive termination as a separate claim; and to prevail on its *dolus* theory, Casco

would have to establish that it would have prevailed in the 2009 lawsuit, something it cannot do.

Casco challenges the ruling contending that impairment of the established relationship may be

---

[4] The 2009 lawsuit originated on a change in the payment terms for whole goods and attachments (not for parts) (Docket No. 232, Trial Transcript of 3/2/16 at pp. 140-141).  The Dealer Agreement was not terminated in 2009.(Id. at p. 141; Docket No. 257, Trial Transcript of of 3/7/16 at p. 40).  But the alleged benefits for the five-year period preceding 2009 were computed by Casco's expert "assuming that the termination took place on September 30, 2009." (Docket No. 234, Trial Transcript of 3/7/16 at p. 6; Docket No. 257, Trial Transcript of 3/7/16 at pp. 73-74; Docket No. 106-1 at pp. 17-18).

actionable as a constructive or *de facto* termination irrespective of whether such impairment does not result in the actual termination of the relationship (Docket No. 264 at pp. 8-9).

First, the text of Law 75, its legislative history and interpretive case law show that termination and impairment are two different categories.  Article 2 of Law 75 forbids three distinct actions by a principal with respect to an established dealer relationship: (1) termination; (2) impairment; and (3) a modality of termination: non-renewal.  And so it provides that:

> Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may terminate said relationship or directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract, on its normal expiration, except for just cause.

See, United Medical Equip. Corp. v. S. Blickman, Inc., 260 F.Supp. 912, 914 (D.P.R. 1966) ("United Medical")(quoting Article 2).  As originally enacted in 1964, however, Article 2 prohibited only termination and refusal to renew a dealer's contract.  To that end, it stated:

> Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may terminate said relationship or refuse to renew said contract on its normal expiration, except for just cause.

See, Law No. 75 of June 24, 1964, 1964 P.R. Laws (4th Reg. Sess., 4th Legislature) at p. 232. Impairment was not actionable then.  In 1966, the Puerto Rico Legislature enacted Law No. 105 of June 23, to amend Article 2 to also forbid impairment without just cause.  In its Statement of Motives, the Legislature explained that:

> [t]he Commonwealth of Puerto Rico cannot remain indifferent to the growing number of cases in which domestic and foreign enterprises, without just cause, eliminate their dealers, or without fully eliminating them, such enterprises gradually reduce and impair the extent of their previously established relationships, as soon as

Casco, Inc. v. John Deere Construction Company & Forestry Company
Civil No. 13-1325
Opinion and Order
Page 9

> these dealers, concessionaries or agents have created a favorable
> market and without taking into account their legitimate interests.

See, Law No. 105 of June 23, 1966, 1966, P.R. Laws (2nd Reg. Sess., 5th Legislature) at p. 332.

Accordingly, the Legislature incorporated the following language into Article 2: "or directly or

indirectly perform any act detrimental to the established relationship." Id. at p. 333. From that

point, impairment without just cause exists under Law 75 as an unlawful conduct, separate and

distinct from termination and non-renewal without just cause.

The decision in United Medical, 260 F.Supp. at 915, places these developments in context.

In that case, the dealer filed suit for impairment under Law 75 as a result of the principal's

appointment of an additional dealer. Even though the lawsuit was filed after the amendment

to Article 2 became effective, the appointment of the additional dealer giving rise to the claim

had occurred several months earlier. Given that the amendment was not retroactive, the court

entered summary judgment dismissing the complaint, noting that the dealer was "exclusively

seeking relief for the impairment of the relation[ship]," and there was "no showing … that the

[principal] [had] actually and totally terminated the dealer's contract." Id. In that regard, the Court

observed:

> The above quoted provisions of the Act, particularly the language
> which has been underscored by the Court [referring to several
> provision of Law 75 as originally enacted, including Article 2],
> leave no doubt whatsoever that what the legislature had in mind,
> upon its adoption, was to prohibit the termination or refusal to renew
> the dealer's contract as a whole, by the principal or grantor on its
> normal expiration, except for just cause, regardless of the existence
> in the contract of a clause reserving to the parties the unilateral right
> to terminate the existing relationship.
>
> The tortious act for which the dealer would have had, under Sec.
> 278b, a right of action to proceed in damages against the principal
> or grantor, would have arisen or come into existence, pursuant to

> said Section, prior to the 1966 Amendment of the Act, only upon the termination of the dealer's contract or the refusal to renew same by the principal or grantor, without just cause, and not because of any other act or thing done by said principal or grantor not amounting to a complete termination of the dealer's contract or to an absolute refusal to renew the same.
>
> [. . . .]
>
> As hereinabove already said, the relief which the plaintiff is seeking in this action **is not one based on the termination of the relationship, which was the only right of action the plaintiff had prior to the 1966 Amendment of the Act**.
>
> It is exclusively seeking relief for the impairment of the relation under the Amendatory Act of 1966, a relief to which it is not entitled under said amendment, inasmuch as the Amendatory Act was not expressly made retroactive by the Puerto Rican Legislature.

See, 260 F.Supp. at 914-15 (emphasis added).  See also, Twin County Grocers, Inc. v. Méndez and Co., Inc., 81 F.Supp.2d 276, 284 (D.P.R. 1999)("With this amendment, 'the protection afforded to dealers under Law 75 was extended to include the conduct of a principal which even though it did not end the contract it was deemed detrimental to the distribution relationship'")(citing Irvine v. Murad Skin Research Laboratories, Inc., 194 F.3d 313, 317-18 (1st Cir. 1999)).

From the same perspective, courts in impairment cases usually constrain recovery of net profits from actual lost sales instead of applying the more severe remedies applied in termination cases.  See, Matosantos Commercial Corp. v. SCA Tissue North America, LLC, 369 F.Supp. 2d 191, 197 (D.P.R. 2005)(concluding that "[i]n impairment case … the amount of damages would be offset by profits realized from continuing sales of the product and the dealer should only be

awarded the profits actually lost …").[5]  And so, a termination action cannot be maintained if the relationship has not ended.  See, Casas Office Machines, Inc. v. Mita Copystar America, Inc., 961 F.Supp. 353, 361 (D.P.R. 1997)("in an infringement case, the dealer is not totally severed from the line as it is in a termination case").  Therefore, termination – however characterized – may only be asserted where there is an  actual and total abrogation of the established dealership relationship.

Casco argues that the Puerto Rico Court of Appeals recognized a constructive termination claim in Eliane Exportadora, Ltda. v. Maderas Alfa, Inc., 2007 WL 2585173 (P.R. App. Ct. June 20, 2007).  In that case, the distributor ceased to purchase products at least five months  before asserting impairment and termination claims as a result of the principal's actions.  The court found impairment because the principal marketed and sold its products through other dealers in violation of the plaintiff's exclusive distribution rights and, in passing, stated that cancelation of the distributor's exclusivity rights "contributed to the  de facto termination of the Dealer's contract." Id. at *13 (certified English translation at Docket No. 278-1 at p. 9).[6]  See also, P.R. Oil Co., Inc. v. Dayco Prods., IBC., 164 D.P.R. 486, 494-95 (2005)(finding termination where the principal ceased dealing with the distributor); Cadierno v. Rowland Coffee Roasters, Inc., 2010 WL 3168203 (P.R. App. Ct. April 30, 2010)(dealer abandoned the line as a result of the principal's abrogation of the dealer's exclusivity rights).  In these cases, the principal decided to cease dealing with the dealer.  In those circumstances, absence of a termination letter does not operate to preclude a finding of termination.  But that is not what happened here in 2009, for as Casco's counsel

---

[5] Consistent with this view, the jury was instructed that "Impairment of contractual rights without just cause requires a compensation based on the benefits the dealer would have made if the impairment had not occurred; that is, the revenue it would have received less costs of generating that revenue, plus out of pocket expenses incurred" (Docket No. 244, Jury Instruction No. 18).
[6]  The decision contains no discussion of constructive termination, and provides no analysis or reasoning for its conclusion.

acknowledged during trial, "[t]here was no termination of the agreement in 2009." See, Docket No. 257 at p. 40.[7]

Second, relying on Márquez v. Torres Campos, 111 D.P.R. 854, 11 P.R. Offic. Trans. 1085 (1982), Casco contends it does not need to prove it would have prevailed in the 2009 lawsuit to recover damages for *dolus* (Docket No. 264 at pp. 17-21). In Márquez, defendant deceitfully sold 25 heads of livestock to plaintiff without disclosing that the farm in which the livestock had been raised had been quarantined for tuberculosis. Plaintiff commingled those 25 heads of livestock in his own farm with 80 new cows that he had purchased from another source intending to raise and sell them in the future. Some of the cows that he purchased became sick with tuberculosis, some had to be sacrificed, and his farm was quarantined by the authorities.

Out of the 105 cows that plaintiff purchased with the intention of raising and selling them for an expected revenue of $26,175.00, plaintiff was able to sell only approximately 77 cows, for a revenue of $3,220.00.00 and a loss of $22,995.00. See, 11 P.R. Offic. Trans. at 1091-1092, 1107 n.20. The trial court awarded plaintiff damages flowing from *dolus*. Accordingly, the Court allowed plaintiff to recover those damages under a contractual *dolus* theory. Id. at 1107. And as to lost profits, it awarded all profits that plaintiff would have realized "as if" he had raised and sold 105 heads of livestock in his farm, which he never did, "but for" dolus. Id.

---

[7] The Legislature of Puerto Rico is familiar with the concept of constructive termination of an established contractual relationship. It incorporated the concept in the definition of discharge – the termination of an employment relationship - set in Article 5 of the Commonwealth's Unjust Discharge Act, Law 80 of May 30, 1976, as amended, P.R. Laws Ann. tit. 29 § 185e. See, Rivera v. Hospital, 614 F.Supp.2d 181, 199 (D.P.R. 2009)(discussing elements of constructive discharge under Law 80); Jorge L. Capó-Matos, in M.J. Caterine (ed.), *Employment at Will: A State-by-State Survey*-Puerto Rico Chapter (2011), pp. 905-911 and 2014 Cumulative Supplement, at pp. 40-8-40-10 (discussing modalities of employment termination in connection with Law 80, including constructive discharge). In 2017, the Legislature amended Law 80, adding elements to the statutory definition of constructive discharge. See, Article 4.6 of the Transformation and Labor Flexibility Act, Law 4 of January 26, 2017 (amending definition of constructive discharge incorporated in Article 5 of Unjust Discharge Act). However, it has not amended Law 75 to recognize and incorporate the concept of constructive termination in that statute.

Casco, Inc. v. John Deere Construction Company & Forestry Company
Civil No. 13-1325
Opinion and Order
Page 13

On Casco's reading, the "as if" and "but for" analysis in <u>Marquez</u> entitles it to recover the value or loss of all profits Casco would have realized under Law 75 but for the *dolus* in 2009 and continuing through the unjustified termination in 2013 (Docket No. 264 at p. 16). There was no dispute in <u>Márquez</u> that plaintiff had a right to raise and sell his cows. But Casco anchors its claims on a potential lawsuit victory, not sales. And Casco cannot show it would have prevailed in that lawsuit – the one it was allegedly induced to settle by deceit – on a constructive termination theory under Law 75.[8] In consequence, Casco's request to vacate the dismissal of Count 4 must be denied.[9]

**3. Counterclaim.**

At trial, Casco's Director of Finance admitted that Casco had not paid the invoices John Deere seeks to collect by way of the counterclaim. <u>See</u>, Docket No. 230 at pp. 39-40. Casco did not prove that it had not received the goods pertaining to the outstanding invoices. In consequence, the court granted John Deere's motion for a partial judgment on the counterclaim. Casco asserts that course of action was mistaken, arguing that John Deere cannot demand the fulfillment of the payment obligation because it had breached without just cause its reciprocal obligation to supply products under the Distribution Agreement and as such, Casco's debt is not due and payable under Article 1077 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 3052. (Docket No. 264 at pp. 25-26).

---

[8] Prior to trial, John Deere moved in *limine* to prevent Casco's expert from testifying about termination damages in 2009 because he had not included any *dolus* calculations in his report (Docket No. 156 at pp. 1, 19). The court denied the request (Docket No. 193 at pp. 4-7). Casco claims the court reversed the rationale of its ruling in *limine* (Docket No. 293 at p. 6). In denying John Deere's motion, however, the court noted the expert had included relevant figures in different parts of his reports. <u>Id.</u> at p. 5. It did not analyze the validity of the *dolus* claim.

[9] Casco asks that the issues related to Counts 3 and 4 be certified to the Puerto Rico Supreme Court (Docket No. 264 at pp. 22-23). Existing authority makes certification unnecessary.

Article 1077 provides a party the right to rescind a bilateral contract based on the counterparty's non-compliance of the same contract, or alternatively demand specific performance, plus damages and interest in each case.    It reads:

> The right to rescind the obligations is considered as implied in mutual ones, in case one of the obligated persons does not comply with what is incumbent upon him.
>
> The person prejudiced may choose between exacting the fulfillment of the obligation or its rescission, with indemnity for damages and payment of interest in either case.  He may also demand the rescission, even after having requested its fulfillment, should the latter appear impossible.

P.R. Laws Ann. tit. 31 § 3052.  Casco cannot request rescission of the Dealer Agreement because it was already terminated when Casco initiated the action.  It did not seek specific performance from the jury, and the jury awarded it damages.  Hence, it would seem that Article 1077 has not application here.

Nevertheless, Casco focuses on the doctrine of *exceptio non adimpleti contractus*, pursuant to which, once a party fails to fulfill its obligations under the contract, the other party is no longer bound to comply with its own obligations under Article 1077.  See, Dyno Nobel, Inc. v. Amotech Corp., 63 F.Supp.2d 140, 151 n.4 (D.P.R. 1999)(explaining doctrine).  At the same time, not every breach of a contractual obligation gives rise to such a defense, for it is necessary that both obligations be truly reciprocal.  In this case, Casco's obligation to pay for goods ordered and received under the Dealer Agreement was not conditional upon the continued existence of the Dealer Agreement.  Pursuant to the Agreement, Casco remained liable for any amounts due even after termination of the Agreement.  See, Joint Exhibit 1, Art. 12.

Casco points the court's attention to Fabregas v. Mayaguez Light, Power & Ice Co., 43 D.P.R. 207 (1932), which held that under Article 1077 a creditor that failed to fulfill an essential

obligation by it to repair a structure quickly as required by the contract cannot demand the debtor to pay an outstanding balance for services rendered and stipulated in the contract (Docket No. 264 at p. 26). But in that case the contractor was deemed entitled to payment for the services effectively provided prior to the resolution of the contract by the other party. Under Fabregas, John Deere is entitled to payment of goods ordered and received by Casco before termination of the Dealer Agreement. Similarly, in Waterproofing Systems Inc. v. Hydro-Stop, Inc., 2006 WL 6561411 (D.P.R. 2006), the court held that notwithstanding Article 1077, the dealer was bound to pay the principal any amounts due for products purchased under the distribution agreement, despite the fact that the agreement was subsequently terminated without just cause. With this in mind, Casco's request for dismissal of John Deere's counterclaim must be denied.

### C. Verdict

During trial, John Deere unsuccessfully requested dismissal of the Law 75 termination claims pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. The jury found against John Deere, awarding Casco $323,440.00 for impairment damages and $1,440,494.00 for termination damages. John Deere renews its Rule 50 motion, and in the alternative, asks for *remittitur* and new trial in conformity with Fed. R. Civ. P. 59 (Docket No. 269 at pp. 1-7).

### 1. Statutory Background.

Law 75 governs the business relationship between principals and the locally appointed distributors who market their products. Caribe Indus. Systems, Inc. v. National Starch and Chemical Co., 212 F.3d 26, 29 (1st Cir. 2000). As noted above, it was enacted to remedy the abusive practices of suppliers who arbitrarily eliminated distributors after they had invested in the business and had successfully established a market in Puerto Rico for the supplier's product or service. Triangle Trading Co., Inc. v. Robroy Industries, Inc., 200 F.3d 1, 2 (1st Cir. 1999).

Similarly, the protection was extended to include conduct of a principal which, short of ending the distribution relationship, nonetheless impairs it.  Irvine, 194 F.3d at 317-318.

To accomplish its goal, Law 75 limits the principal's ability to act except for just cause, while subjecting the principal to considerable economic liability.  To this end, it defines just cause as the "[n]onperformance of any of the essential obligations of the dealer's contract ... or any action or omission on [the dealer's] part that adversely and substantially affects the interests of the principal... in the marketing or distribution of the merchandise or service."  P.R. Laws Ann. tit. 10 § 278(d).  See also, R.W. Intern. Corp. v. Welch Foods, Inc., 88 F.3d 49, 51 (1st Cir.1996); La Playa Santa Marina, Inc. v. Chris-Craft Corp., 597 F.2d 1, 4 (1st Cir.1979).

### 2. **Impairment**.

The jury determined that John Deere unjustifiably cancelled Casco's December 2012 Sales Order and that the cancellation impaired Casco's rights under the Dealer Agreement (Docket Nos. 243, 277-1).  Law 75 forbids a principal from unjustifiably "perform[ing] any act detrimental to the established relationship." P.R. Laws Ann. tit. 10 § 278a.  That protection is only against detriment to a dealer's contractually acquired rights.  See Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc., 23 F.3d 564, 569 (1st Cir. 1994); General Office Prods. Corp. v. Gussco Mfg., Inc., 666 F.Supp. 328, 331 (D.P.R. 1987)(same). Where a dealer's contractually acquired rights have not been impaired in any way, Law 75 does not come into play. Vulcan Tools, 23 F.3d at 569.

Viewing the evidence in the light most favorable to Casco, the Dealer Agreement granted Casco the exclusive right to sell and distribute the products covered by the contract.  The "industrial products" in the Agreement include John Deere's construction equipment and parts.  An excavator was one of the many products that Casco had a contractual right to order from John Deere for sale and distribution in Puerto Rico.  In December 2012, Casco placed a purchase order

for a John Deere 290 GLC model excavator, as Casco had sold the excavator to a customer, Nogama Construction. John Deere, however, cancelled the order, stating in the cancellation letter that Casco had not satisfied the New Model Qualification ("NMQ") requirement to be able to purchase that model of excavator.

The NMQ required, among things, for Casco to have its employees take online training courses at John Deere University to be able to serve new models of construction equipment. John Deere claims Casco failed to establish that the cancelation impaired any rights it had under the Dealer Agreement because Casco had failed to comply with John Deere's parts and service management programs, which included compliance with NMQ requirements; and for the same reason, that John Deere had a right to refuse any order for any machine for which Casco had failed to comply with the NMQ process.

Casco counters that Mr. Gil Melecio, Casco's Parts and Service Manager, testified that, since around September 2012, Casco's access to John Deere University's computer system had been blocked; and that despite repeated requests over the course of several weeks for John Deere to help, he was unable to register Casco's mechanics to take training courses required by the NMQ's. Likewise, it observes that John Deere had a company policy that provided a 90-day grace period for its dealers to complete the NMQ's after delivery of every new model to a customer; that Mr. Alfredo Izaza, John Deere's Territory Manager, represented to Casco that John Deere's restriction from serving the order operated before shipment of a machine and the system made no exceptions; and that contrary and unbeknownst to Casco, John Deere allowed grace periods to other dealers that had not completed the NMQ's but refused to apply its policy to benefit Casco. Casco states that had John Deere not canceled the order, it would have been able to buy the excavator and comply with the NMQ's for that specific model after delivery of the machine to the

customer.  There was sufficient evidence for the jury to conclude that John Deere's cancellation of the order lacked just cause and impaired Casco's right to purchase and sell products under the contract in violation of Law 75.

### 3.  **Termination**.

Pursuant to Law 75, the principal bears the burden of proving just cause for termination. See, Newell Puerto Rico, Ltd. v. Rubbermaid, Inc., 20 F.3d 15, 22 (1st Cir. 1994)(noting the principal has "the burden of persuasion to prove the factual elements of the just cause inquiry"). The jury concluded John Deere failed to demonstrate that it terminated the Dealer Agreement with just cause (Docket No. 243 at p. 2; Docket No. 277-1 at p. 2).  John Deere takes issue with the jury's finding, contending Casco breached a number of essential obligations regarding: timely payments; compliance with NMQ requirements; stock and maintenance of adequate whole goods and attachment inventories to meet trade requirements; qualified and trained sales, parts, service and administrative personnel to provide market penetration, coverage and service to maintain a high reputation for John Deere goods in the Territory; and identification of its facilities with approved John Deere signs and/or trademarks (Docket No. 269 at pp. 8-30).  Moreover, it points out Casco never provided John Deere with a business plan, and failed to take appropriate action to correct deficiencies in the performance of its obligations, to maintain a level of positive net worth for its business sufficient to achieve market penetration and render service at levels acceptable to John Deere, all of which made John Deere insecure in continuing to do business with Casco and justified termination of the Dealer Agreement.  Id. at pp. 31-33.

Placing the relationship between the parties in context, Casco counters that as presented to the jury, in 2002 John Deere wanted to replace Casco's dealer's contract to prohibit competition. Casco did not agree because the dealer contract had no such prohibition. Enrique Irizarry and

Johanna Rivé testified that, since 2002 through 2005, John Deere's executives made threats against Casco to withdraw support if its owners – the Irizarry family – had any business with Volvo. John Deere did not provide competitive financing terms for Casco Rental's fleet and its executives were upset at Casco for looking for financing elsewhere. In 2007, John Deere revoked a monetary contribution of $7,500.00 for Casco's open house, because of Volvo, although nothing that Casco did violated the Agreement. In 2008, John Deere used the dealer contract to its advantage to revoke a price discount to Casco saying it was "discretionary" and not its obligation. Further, for every year since 2009, John Deere excluded Casco from its important regional and annual dealer conferences, because of alleged confidentiality concerns with Volvo. These conferences were important for Casco to obtain information to serve the market for John Deere in Puerto Rico. Yet no other dealer of John Deere was excluded even though John Deere itself had a business relationship with Volvo in the United States and had no basis for any confidentiality concerns, for no evidence existed that Casco ever used any confidential information against John Deere.

As described by Casco's Parts and Service Manager, by September 2012 his access to John Deere's computer system was blocked. Because of it, Casco's mechanics could not register to complete the training courses required to serve John Deere's machines with IT4 engines. But John Deere never fixed this problem. In December 2012, John Deere cancelled a purchase order from Casco due to NMQ noncompliance, yet in February 2013 it offered to sell a new construction machine with an IT4 engine to Monsanto Corporation, one of John Deere's national accounts, even though Casco had not completed the NMQ requirements to serve that machine. Similarly, John Deere applied an internal company policy allowing grace periods for other dealers to take corrective action and comply with NMQ's, but not to Casco.

<u>Casco, Inc. v. John Deere Construction Company & Forestry Company</u>
Civil No. 13-1325
Opinion and Order
Page 20

        In connection with John Deere's interests, Casco observes that it aggressively promoted the market for John Deere's products.  From 2009 to 2012 it sent over 180 different written quotations for the sale of John Deere machines to customers in Puerto Rico; made regular visits to customers; participated for John Deere in government bids; and attended trade shows.  Between 2009 and 2013, the majority of Casco's parts orders were "machine down" orders, not stock orders; and Casco's customers had to wait between two and three days for the parts necessary to repair their equipment were received at Casco.  But there was no evidence the contract required Casco to order or have any number of machines on stock.  Instead, the evidence supports the inference that Casco had an adequate inventory of John Deere parts and machines to meet all the customers' needs and demand for John Deere products.  No customer complained about Casco's services before John Deere terminated the Dealer Agreement in March 2013.

        Nor was there evidence that the contract required Casco to meet John Deere's expectations of achieving a market share, or to submit an "aggressive" written business plan.  Likewise, Casco's net worth did not affect its level of service to customers of John Deere products.  Again, not one customer in Puerto Rico complained about Casco's services before the contract was terminated.  And John Deere presented no evidence that Casco's failure to provide audited financial statements for every year adversely and substantially affected its interests in Puerto Rico. Ostensibly, John Deere would use the financial statements to determine Casco's creditworthiness, but the jury was entitled to consider that John Deere had adequate security from Casco's owners' personal guarantees from which to collect in the event it extended credit to Casco and was not paid.

        As to Casco's not putting up a John Deere sign in its dealership and for placing Volvo Rent stickers over the logos of a few John Deere machines on inventory.  Additionally, Casco introduced admissible evidence that John Deere's new and different sign was costly to install in the new

location in Toa Baja; Volvo stickers were placed inadvertently in a few machines and removed

before the machines ever left the yard; and Casco had not lost any business opportunities for the

sale of John Deere products because of its fault.  Nor was evidence to damage to John Deere's

trademarks or reputation presented.

Still, when John Deere terminated the agreement, Casco was behind in payments.

Normally, paying for goods on time is one of the essential obligations of the dealer's contract, the

non-fulfillment of which has been recognized as just cause for termination under Law 75.  See,

See also, PPM Chemical Corp. of P.R. v. Saskatoon Chemical Ltd., 931 F.2d 138, 139 (1st Cir.

1991) (pointing out that "paying for goods on time normally is one of the "essential obligations of

the dealer's contract") (citation and internal quotation marks omitted); Kemco Food Distributors,

Inc., 2016 WL 814833, at *3 (acknowledging dealer's timely payment obligation).  But Casco

asserts that payment of bills by a due date was not defined as an "essential obligation" in the Dealer

Agreement.  John Deere contests the assertion, stating that timely payments were essential.  Casco

responds that under the circumstances here, the jury was entitled to consider evidence of the

adequacy or reasonableness of Casco's performances and course of conduct to determine if not

paying all the bills fully and on time was just cause for cancelling this 27-year old business

relationship.  See, Casco Inc. v. John Deere Const. Co. and Forestry Co., 2014 WL 4233241 at

*10 (D.P.R. Aug. 24, 2014)(Gelpí, J.)(holding that jury was so entitled).

In that regard, Casco states that from 2009 to 2012, it fell behind in its payments on very

few occasions; by December 2012 it was current in its payments to John Deere when John Deere

cancelled the purchase order, which impacted Casco's cash flow and ability to pay; and from

January 2013 through the termination in March 2013, Casco made 7 partial payments to John

Deere totaling $224,000.00.  John Deere's argument does not lack support.  The fact that the

principal may have tolerated due balances and attempted to resolve the dispute amicably through reasonable payment plans does not mean that they altered the terms and somehow excused the dealer's timely performance. Tatan Management v. Jacfran Corp., 270 F.Supp.2d 197, 203 (D.P.R. 2003).

The adjudication of competing inferences arising from this disputed setting corresponded to the jury. Based on the totality of conflicting evidence, the jury could have reasonably concluded – as it did - that John Deere did not meet its burden of proving just cause for termination. See, Newell Puerto Rico Ltd., 20 F.3d at 15 (affirming judgment denying principal's post-judgment motions to vacate jury verdict finding a failure to prove just cause for termination under Law 75). The liability verdict for the termination claim must, therefore, stand.

**4. Damages**.

    **a. Impairment**.

Compensation for unjust impairment under Law 75 is limited to the profit that the distributor would have made if the impairment had not occurred, that is, the revenue it would have received less the costs of generating that revenue, plus any related out of pocket expenses incurred. The jury was so instructed (Docket No. 244 at 22, Jury Instruction No. 18). The jury awarded Casco $323,440.00 for impairment as follows:

    (a) Expected Revenue: $32,940.00

    (b) Expenses necessary to generate Revenue: $274,500.00

    c) Related Expenses: $16,000.00

    (d) Total: $323,440.00

(Docket No. 243).

John Deere posits the jury made a clear and identifiable error in determining Casco's impairment damages, and maintains the verdict was excessive as a matter of law in that it exceeds any rational appraisal or estimate of the impairment damages that could be based upon the evidence before the jury. Thus, it asks for *remittitur* or a new trial. Casco claims the jury must reasonably have understood that the undiscounted sales price in Casco's quotation of the excavator ($274,500.00.00) was a necessary expense that Casco would have to incur in the future to generate revenue but for the wrongful impairment, and that the award does not exceed any rational appraisal or estimate of the damages that could be based upon the evidence (Docket No. 277 at p. 31).

Contrary to Casco's view, Law 75 does not allow recovery of expected future revenue as impairment damages. See, Matosantos Commercial Corp. v. SCA Tissue North America, LLC, 369 F.Supp.2d 191, 197 (D.P.R. 2005)("In an impairment case … the amount of damages would be offset by profits realized from continuing sales of the product and the dealer should be awarded the profits actually lost"). For the same reason, neither the instructions nor the special verdict form asked the jury to consider expected future revenue in assessing impairment damages. And there was evidence admitted at trial about expected future revenue from Casco's prospective purchaser, Nogama.

From this perspective, the amount the jury awarded for impairment does not reflect the evidence presented to sustain it or the instructions provided to calculate the amount. During trial the parties coincided that based on the evidence, impairment damages amounts to $58,000.00. See, Trial Transcript, March 7, 2016, Afternoon Session at p. 10: John Deere's Attorney commenting that based on Casco's President's testimony, the total alleged impairment of the cancellation amounts to $58,000.00; Casco's counsel noting that the loss suffered by impairment is in the neighborhood of $58,000.00 (id. at p. 58), the same amount he asked the jury to award as

compensation for impairment.  See, Trial Transcript, March 11, 2016 at p. 23.  Along the same line, John Deere's attorney argued in summation that $58,000.00 is the limited extent of the impairment damages.  Id. at p. 27.  As such, even though there is a need to adjust the amount to be paid, there is no need for a new trial in lieu of a *remittitur*.  Hence, compensation for impairment is set at $58,000.00.

### b.  Termination.

Compensation for unjust termination under Law 75 essentially reflects loss of profit obtained in the distribution of the line during the five years preceding termination, loss of goodwill, and loss of inventory on stock.  The jury awarded Casco $522,011.00 for loss of profit (Docket No. 243 at p. 3; Docket No. 277-1 at p. 3), the amount Casco's expert calculated for this concept. John Deere claims the expert mistakenly altered his methodology.

In computing the Fifth Line Year (April 2012 to March 2013) calculation, the expert used 50 % of the Total Company Sales from one of Casco's fiscal years as reported in Casco's financial statements for Line Years One to Four, 50% from another fiscal year, and added the two averages together to come up with the "Total Company Sales."  However, for the Fifth Line Year he used 50% of the "Total Company Sales" from Casco's fiscal year 2011-2012, adding the actual 2012-2013 sales for the six-month period from October 2012 to March 2013, including $963,682.00 of rental revenue as part of the "Total Company Sales" for the Fifth Line Year.  John Deere contends that taking into consideration the impact that these two methodological elements have on Casco's five-years profits computation, the lost profits award of $522,011.00 is excessive as a matter of law, and requires a remittitur of $118,442.00 on the five-year profits award.

Casco's President testified that the company suffered actual damages and loss of future income from the termination consisting of loss of revenue of $2.4 Million per year in parts and

Casco, Inc. v. John Deere Construction Company & Forestry Company
Civil No. 13-1325
Opinion and Order
Page 25

services and $450,000.00 in equipment sales.  Casco's expert quantified the damages at trial

following the formula set in Law 75, calculating a value of Casco's lost profits of $522,011.00 for

a five-year period prior to 2913 and loss of goodwill of $918,483.00 under a discounted earnings

method, for a total of $1,440, 494.00.

Casco's expert stood firm throughout trial that the amounts of damages for the 2013

termination were correct, with the exception that his estimate for the loss of inventory needed

adjustments.[10]  He explained that his formula was consistent with the gross-to-gross allocation

method developed by experts, and did not agree with the premises or conclusions reached by John

Deere's counsel during cross-examination to compute Casco's profits.  He suggested that a

downward adjustment of 10 % in his goodwill computation could be made to account for having

included income derived from the rental operations for the last line year and excluded the costs.

But he also pointed out that there is a valuation method accepted by experts in his flied that does

not require imputing any portion of the selling, general and administrative expenses of the business

as he had done, to compute the direct contribution of the line.

At the end of the day, the jury had a number of choices from which to render an award,

facing a contest between competing experts.   That it selected a number from the higher end of the

scale from Casco's expert's testimony and rejected John Deere's expert opinion is not a valid basis

to overturn or modify the award of damages.  See, Newell Puerto Rico, 20 F.3d at 22 (affirming

jury verdict of $ 1,400,000 in termination damages under Law 75).

---

[10] The court did not submit loss of inventory to the jury, and the jury did not award any damages for loss of inventory (Docket No. 277 at p. 24 n.8). Casco waived at trial the claim to recuperate the cost of inventory on stock.  Id.

**5.  Counterclaim**.

As stated above, the court granted John Deere's motion for judgment as a matter of law on

its counterclaim, awarding John Deere $216,919.92.  In a post-judgment motion, John Deere asks

that the amount be increased to $219,913.00 under Fed. R. Civ. P. 59(e)(Docket No. 269 at p. 55;

Docket No. 294 at p. 10).  As support, it states that both Casco's statement of account as of January

31, 2016 (Defendant's Exhibit E) and the testimony of one of John Deere's witnesses (Víctor

Mauricio Lara) confirm the amount (Docket No. 269 at p. 55).  Id.  Casco opposes the request,

noting that John Deere did not move at trial to request the specific amount it now requests post-

judgment or move to amend the court's order granting the counterclaim by way of a Rule 50(a)

motion, and states that a Rule 59(e) motion such a John Deere's cannot raise arguments that should

have been raised before entry of judgment (Docket No. 277 at pp. 29-30).

The court entered judgment for $216,919.92, the amount John Deere set in a motion to

modify the Joint Modified Pretrial Order filed on February 4, 2016.  See, "Motion to Update

Amount of John Deere's Counterclaim in the Joint Modified Pretrial Order (Dkt. 197)" at Docket

No. 200.  The motion identified such amount as that due as of December 27, 2015.  Id.  at p. 2.

Casco's statement of account, authenticated by Mr. Lara and admitted without objection identifies

$219, 913 as the amount due as of January 31, 2016 (Trial Transcript March 8, 2016 at pp. 17-20).

By the time of Mr. Lara's testimony, the court had already granted John Deere's Rule 50 motion

on its counterclaim.  However, judgment had not been entered.  So an adjustment in the amount

due will be made for $3,000.08, making Casco liable for $219,913. 00.

**D.  Costs**

Asserting "prevailing party" status, both parties seek to recover costs under Rule 54 of the

Federal Rules of Civil Procedure (Docket Nos. 251 and 260).  This rule states, in part, that unless

a federal statute, the rules of civil procedure or a court order provides otherwise, costs other than attorney's fees should be allowed to "the prevailing party."  <u>See</u>, Fed.R.Civ.P. 54(d)(1).  Casco prevailed under Law 75, obtaining a jury award of $1,763,934.00, whereas John Deere prevailed on the counterclaim related to unpaid invoices in the amount of $219,913.00.

For Casco, the proportion of the amount awarded – more than eight times that of John Deer – disposes of this matter. John Deere takes issue, noting that Casco: sued for $10,000,000.00 yet was awarded $1,763,934.00; sought injunctive relief, which was denied; and unsuccessfully brought suit for two claims under the Civil Code, both of which were dismissed.  At the same time, John Deer says, it prevailed on its counterclaim – for $219,913.00.  Therefore, it should be considered prevailing party or, in the alternative, each of the parties should bear its own costs.

A claimant who has obtained some relief usually will be regarded as the prevailing party even though the party has not sustained all his claims.  <u>See</u>, Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, 218-224, § 2667 (discussing principle). Similarly, courts may apportion costs among the parties or reduce the size of the prevailing party's award to reflect the partial success.  <u>Id.</u> at pp. 221-224 (so noting).  Considering the issues at stake here, Casco prevailed.  But even focusing on the feasibility of apportionment, John Deere is not entitled to the amounts it seeks to recover as costs, expenses for daily trial transcripts, deposition transcripts and related expenses, and paper and electronic copies.  Those costs are either not taxable or only taxable under special circumstances, and John Deere has not shown that special circumstances exist.

First, the Court's 2007 Taxation of Costs Guidelines ("Guidelines") state that generally, daily transcripts of court proceedings are not taxable as costs. Section II. C.  The Guideline is consistent with 28 U.S.C. § 1920, which as relevant, limits fees to printed or electronically

Casco, Inc. v. John Deere Construction Company & Forestry Company
Civil No. 13-1325
Opinion and Order
Page 28

recorded transcripts necessarily obtained for use in the case.  When daily transcripts are obtained

for the convenience of counsel, they are not taxable as costs.  See, Paul N. Howard Co. v. Puerto

Rico Aqueduct and Sewer Authority, 110 F.R.D. 78, 81 (D.P.R. 1986)(so noting).  John Deere has

not specified in what way the transcripts were necessary rather than just convenient to its case.[11]

Second, the Guidelines provide that in general, costs incurred in taking depositions will be

taxed in favor of the prevailing party when the depositions are introduced as evidence, used at trial

or in a successful motion for summary judgment.  Section II. C.  John Deere has not demonstrated

that it took depositions for a purpose other than discovery or preparation.  As such, the expense

cannot be taxed as costs.

Third, under Section 1920 a court may tax the costs of making copies of any materials

where the copies are necessarily obtained for use in the case.  See, 28 U.S.C. § 1920(e)(so

authorizing).  Along the same line, the Guidelines state that photocopying costs for the

convenience, preparation, research or records of counsel may not be recovered.  In order for copies

to be taxable, the party seeking to tax the cost must show some evidence of necessity.  That

showing is lacking here, for John Deere does not describe or identify what trial exhibits it refers

to.

Fourth, Section 1920 allows a court to tax costs incurred for the compensation of

interpreters.  See, 28 U.S.C. § 1920(6)(authorizing cost).  However, costs stemming from the

translation of written documents do not qualify as compensation of interpreters within the scope

of Section 1920.    See, Taniguchi v. Kan Pacific Saipan, 566 U.S.----, 132 S.Ct. 1997

---

[11] John Deere states the transcripts were essential to its counsel's effective performance and proper handling of the case, especially the presentation and argumentation of John Deere's motion for judgment of law under Rule 50(a), which succeeded in dismissing Counts 3 and 4 of Casco's Complaint, as well as in prevailing on John Deere's Counterclaim (Docket No. 260-5 at p. 6).  Given the legal issues involved, transcripts were not needed to argue dismissal of those counts or with respect to the Counterclaim.

Casco, Inc. v. John Deere Construction Company & Forestry Company
Civil No. 13-1325
Opinion and Order
Page 29

(2012)(concluding that because the ordinary meaning of interpreter is someone who translates orally from one language to another, the category of "compensation of interpreters" in Section 1920 does not include costs for document transation); Dávila-Feliciano v. Puerto Rico State Ins. Fund, 683 F.3d 405, 406 (2012)(same)(citing Tanigushi).  With that in mind, document translation expenses cannot be taxed as costs.[12]  Nevertheless, John Deere seeks costs with respect to $350.00 incurred in connection with services provided by a court-certified interpreter for the taking of the deposition of Mr. Gilberto Melecio.  The Guidelines state that interpreter's fees for services provided during trial or deposition when the same is a taxable expense, are taxable costs.  Section II. H.  But John Deere has not demonstrated that Mr. Melecio's deposition could have been taken for a purpose other than discovery or preparation.  In consequence, the expense corresponding to the translation is not taxable as cost.

As for Casco's request of attorney's fees and costs, John Deere argues that Casco's motion is premature.  Local Civil Rule 54 (a) provides that:

> An application for attorneys' fees in those cases in which fees have been contracted for or in any case in which no notice of appeal has been filed shall be filed within fourteen (14) days of the expiration of the time for filing a timely appeal.
>
> An application for fees in all other cases shall be filed within fourteen (14) days after issuance of the mandate.  A claim for fees filed before the final disposition of any appeal shall have no effect and a new application must be filed within the time prescribed herein.

In conformity with the rule, a trial court need not rule on a request for an award of attorneys' fees until after the Court of Appeals decides any challenges to the  underlying claims.  Ojeda-

---

[12] John Deere acknowledges that it overlooked Tanigushi and Dávila Feliciano (Docket No. 280 at p. 8).  So did Casco.  See, Docket No. 251 at ¶ 29.

Rodríguez v. Zayas, 666 F.Supp. 2d 240, 267 (D.P.R. 2009); Orr v. Mukasey, 631 F.Supp.2d 138,

158 (D.P.R. 2009).   Similarly, the rule has been applied to deny without prejudice,

plaintiffs' motion for fees and costs in cases where defendants filed post-trial motions under

Rule 50 for judgment as a matter of law, and for remittitur and new trial under Rule 59.   See,

Ojeda-Rodríguez, 666 F.Supp.2d at 267; Orr, 631 F.Supp.2d at 159.   For the same reason, denial

without prejudice is appropriate here.

Casco takes issue with dismissal arguing Local Civil Rule 54 is contrary to Rule 54 (d) of

the Federal Rules of Civil Procedure, which states in part:

> (d) COSTS; ATTORNEY'S FEES.
>
> (1)    *Costs Other Than Attorney's Fees.* Unless a federal statute,
> these rules, or a court order provides otherwise, costs—other than
> attorney's fees—should be allowed to the prevailing party.
>
> (2)    *Attorney's Fees.*
>
> (A)    *Claim to Be by Motion.* A claim for attorney's fees and
> related nontaxable expenses must be made by motion unless the
> substantive law requires those fees to be proved at trial as an element
> of damages.
>
> *(*B*). Timing and Contents of the Motion.* Unless a statute or a court
> order provides otherwise, the motion must: (i) be filed no later than
> 14 days after the entry of judgment;

Casco states that Local Civil Rule 54 exceeds the scope of authority granted to adopt local

rules, and in any event, sound grounds exist to depart from the local rule here (Docket No. 266 at

pp. 5-6).   It points out that the Advisory Committee's note on the 1993 amendments to

Fed.R.Civ.P. 54, recognizes that the 14-day period set in the rule assures the opposing party is

informed of the claim before the time for appeal has elapsed, affording the court the opportunity

to resolve fee disputes shortly after trial, while the services performed are freshly in mind while

permitting the ruling to be made in time for any appellate review of a dispute over fees to proceed at the same time as review on the merits of the case. Fed.R.Civ.P. 54(d)(2)(B)(i) Advisory Committee's note (1993).

But the Advisory Committee notes also state that if an appeal on the merits of the case is taken, the court may deny the motion without prejudice, directing a new period for filing after the appeal has been resolved. And that is what Local Rule 54 deals with. Thus, similar rules have been validated against challenges predicated on Fed.R.Civ. P. 54. See, Johnson v. Lafayette, 51 F.3d 726, 729 (7th Cir. 1995); Spooner v. EEN, Inc., 829 F.Supp.2d 3, 6 (D.Me. 2010). Considering the contested nature of this litigation, it is reasonable to assume the case will not end here. If it does, Casco may refile its motion as contemplated in the rule. In the event the case is appealed and Casco prevails, it may move the court for fees and costs within the period specified in Fed.R.Civ.P. 54 and Local Rule 54. Therefore, Casco's verified application must be denied without prejudice.

### III.    CONCLUSION

There was a legally sufficient evidentiary basis for a reasonable jury to find John Deere liable under Law 75. The verdict is not against the weight of the evidence. Upholding it will not result in a miscarriage of justice. Termination damages are properly supported. The jury confronted conflicting explanations from expert witnesses and chose one side over the other. Even though it did not follow instructions regarding computation of impairment damages, from their representations during trial the parties were aligned as to what the evidence supported on that basis. For the same reason, the amount will be adjusted without need to provide a choice between *remittitur* or a new trial. Adjustment is also appropriate in connection with the amount due under

the counterclaim.  John Deere is not entitled to costs.  Casco may renew its motion for fees and costs as specified in this Opinion and Order.

In view of the foregoing, the requests at Docket Nos. 251 and 253 are DENIED WITHOUT PREJUDICE; the motion to dismiss without prejudice at Docket No. 263 is GRANTED; the motion at Docket No. 287 is DENIED AS MOOT; the motion at Docket No. 264 is DENIED; the motion at Docket No. 269 is GRANTED IN PART AND DENIED IN PART; and the Bill of Costs at Docket No. 260 is DENIED.

**SO ORDERED**.

In San Juan, Puerto Rico, this 30th day of March, 2017.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge